**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Armando Daniel,<br><br>Plaintiff,<br><br>v.<br><br>Nancy A. Berryhill,<br>Acting Commissioner of Social Security,<br><br>Defendant. | No. CV-15-0452-TUC-BGM<br><br>**ORDER** |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 15). Defendant filed her Brief ("Response") (Doc. 20), and Plaintiff filed his Reply Brief ("Reply") (Doc. 21). Plaintiff brings this cause of action for review of the final decision of the Commissioner denying Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") disability benefits pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. §1383(c)(3). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

. . .

. . .

I.      **BACKGROUND**

        A.      *Procedural History*

        On June 13, 2012, Plaintiff filed a Title II application for Social Security Disability Insurance Benefits ("DIB"), as well as a Title XVI application for Supplemental Security Income ("SSI"), alleging disability as of January 1, 1990 due to obstructive sleep apnea status post uvulopalatopharyngoplasty, diverticulitis, diabetes, inflammatory polyarthropathy, obesity, degenerative disc disease of the lumbar spine, adjustment disorder with mixed anxiety and depressed mood, borderline intellectual functioning, and learning disorder.  *See* Administrative Record ("AR") at 19, 21, 52, 70, 74, 76, 82, 86, 88, 96, 100–01, 104, 109, 113–14, 117, 198–200, 202–03, 218, 222, 227, 236, 253, 308.  Plaintiff's date last insured is September 30, 1990.  *Id.* at 21, 49, 70–71, 75, 87, 91, 100, 104, 109, 205, 243.  The Social Security Administration ("SSA") denied these applications on October 11, 2012.  *Id.* at 19, 68–93, 122–29.  Plaintiff filed a request for reconsideration, and on May 15, 2013, SSA denied Plaintiff's applications upon reconsideration.  *Id*. at 19, 94–121, 131–36.  On May 21, 2013, Plaintiff filed his request for hearing.  *Id.* at 19, 137–38.  On February 28, 2014, a hearing was held before Administrative Law Judge ("ALJ") Laura Speck Havens.  AR at 19, 46–67.  On May 8, 2014, the ALJ issued an unfavorable decision.  *Id.* at 16–33.  On June 3, 2014, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on July 24, 2015, review was denied.  *Id.* at 1–7, 13–14.  On September 23, 2015, Plaintiff filed this cause of action.  Compl. (Doc. 1).

 . . .

### B.    Factual History

Plaintiff was forty-three (43) years old at the time of the administrative hearing and nineteen (19) at the time of the alleged onset of his disability.  AR at 21, 32, 49–50, 68–71, 82, 94–96, 109, 175, 179, 205, 207, 243.  Plaintiff has a high school education through special education and attempted approximately two (2) semesters of college.  *Id.* at 51, 212, 295.  Prior to his alleged disability, Plaintiff worked briefly as a laborer in an automotive shop in 1996, but otherwise has no work history.  *Id.* at 31–32, 212.

### 1. Plaintiff's Testimony

#### a. Administrative Hearing

At the administrative hearing, Plaintiff testified that he received a high school diploma through special education classes and approximately two semesters of college.  AR at 51, 61.  Plaintiff currently lives in an apartment with his mother, who is disabled.  *Id.* at 52–53.  Plaintiff further testified that he is able to dress and bathe himself and take his medications, as well as do his own laundry, cooking, and food shopping.  *Id.* at 53–54, 62.  Plaintiff does not have any hobbies, but watches television three (3) to four (4) hours per day.  *Id.* at 54.  He walks approximately ten (10) to fifteen (15) minutes at a time, and tries to stretch to relieve his muscle pain.  *Id.* at 54–55.

Plaintiff testified that he no longer has a driver's license, because it has been suspended.  AR at 55.  Plaintiff further testified that he had an accident where he fell asleep while driving and hit a bus.  *Id.* at 55–56, 63.  Plaintiff testified that he has problems keeping his food down, and sometimes has trouble with decreased appetite.  *Id.* at 56–57.  Plaintiff also testified that he sleeps approximately three (3) to four (4) hours

per night, and wakes approximately every hour and forty-five (45) minutes.  *Id.* at 56–57.

Plaintiff testified that some of his medications, Celebrex and Plaquenil specifically, cause

stomach upset and gastrointestinal distress.  *Id.* at 58–59.  Plaintiff further testified that he

sees his regular doctor at least once per month, and his rheumatologist, neurologist, and

stomach specialist every six (6) to eight (8) weeks.  AR at 59.

Plaintiff testified that he can stand for ten (10) to fifteen (15) minutes, and sit for

thirty (30) to forty-five (45) minutes.  *Id.*  Plaintiff further testified that he could pick up

ten (10) pounds using both hands.  *Id.*  Plaintiff testified that he has pain all over, but his

back and leg pain is the worst.  *Id.* at 60.  Plaintiff also testified that with medication, his

pain level has decreased to a five (5) out of ten (10) with ten (10) being the very worst

pain.  *Id.*

Plaintiff testified that he is only able to write simple phrases, and needed help

filling out the disability forms.  AR at 51–52, 61.  Plaintiff further testified that he cannot

read the newspaper, but can perform simple addition and subtraction.  *Id.* at 52, 61.

Plaintiff also testified that he has difficulty staying focused or on task when directed to do

multiple things.  *Id.* at 62.  Plaintiff testified that he is constantly overwhelmed due to

anxiety, and because of this likes to be alone.  *Id.*

Plaintiff testified that he is most comfortable in a recliner or lying in bed.  *Id.* at

63.  Plaintiff further testified that he takes two (2) to three (3) hour naps every day, and

will fall asleep even while doing something.  AR at 63–64.  Plaintiff also testified that his

lupus causes him to lack energy and be severely fatigued.  *Id.* at 64.  Plaintiff testified

that he no longer goes to church because he cannot alternate between sitting and standing.

*Id.* at 65.   Plaintiff also testified that his migraine headaches are less frequent with medication, but he still has them once or twice a month.  *Id.*  at 66.  These headaches last from an hour or two (2), to two (2) to three (3) days.  *Id.*

### b. Administrative Forms

With assistance, Plaintiff completed a Function Report—Adult in this matter.  AR at 217–26.  Plaintiff stated that he is "unable to hold a job due to learning disability[.]"  *Id.* at 217.   He noted that cares for his twin five (5) year old daughters and can take walks.  *Id.* at 218.   Plaintiff indicated that he suffers from sleep apnea.  *Id.*  Plaintiff further indicated that he can perform his personal care without assistance, and cook meals.  *Id.* at 219.   Plaintiff also stated that he can perform household chores, and takes daily walks.  AR at 220.  Plaintiff is also able to shop weekly.  *Id.* at 220–21.  Plaintiff can pay bills and talks to others approximately once per week.  *Id.* at 221.

Plaintiff's ability to lift, squat, and bend is limited, and he can walk for approximately one quarter (1/4) of a mile before needing to stop and rest.  *Id.* at 222.  Plaintiff can pay attention for approximately thirty (30) minutes, but is unable to understand written instructions and is very limited in his ability to follow spoken instructions.  *Id.*  Plaintiff has difficulty handling stress and changes in routine.  AR at 223.

Plaintiff states that his biggest problem is his inability to under written or verbal instructions and his learning disability.  *Id*. at 224.  Plaintiff further states that his diabetes is limiting his ability to control his depression.  *Id.*

## 2.  Vocational Expert Report

The ALJ did not call a vocational expert to testify at the hearing.

On February 14, 2014, Plaintiff was evaluated by Philip Shapiro, M.S., C.V.E., C.R.C., at counsel's behest.  AR at 29, 438.  Mr. Shapiro stated that Plaintiff had been "referred for a vocational evaluation to assess the client's aptitudes, abilities and physical tolerances in a variety of occupational areas in order to provide information in terms of vocational potential for use in Mr. Daniel's Social Security disability hearing."  *Id.* at 438.  Mr. Shapiro reviewed Plaintiff's medical history as narrated by Plaintiff, as well as his educational and employment history.  *Id.* at 438–40.  Plaintiff indicated that he had earned a high school diploma through special education classes, but did not have success in college.  *Id.* at 439.

Mr. Shapiro administered several academic achievement tests to Plaintiff.  *Id.* at 440.  Plaintiff obtained a score at the 6.3 grade level for the Vocabulary subtest of the Nelson-Denny Reading test.  AR at 441.  Mr. Shapiro indicated that this score is below average for Plaintiff's age group.  *Id.*  On the untimed SRA Reading Index, Plaintiff showed proficiency in the Picture-Word Association, Word Decoding, and Phrase Comprehension subtests.  *Id.*  Mr. Shapiro stated that "[t]hese results indicate the client has the ability to read and understand simple sentences, depending on knowing the meaning of the preposition."  *Id.*  On the Wide Range Achievement Test ("WRAT") Spelling subtest, Plaintiff scored at the 2.8 grade level.  *Id.*  Mr. Shapiro noted that this score is considered deficient or below average for Plaintiff's age group.  AR at 441.

On the WRAT Math Computation subtest, Plaintiff scored at the 4.8 grade level.

*Id.* Mr. Shapiro noted that this would be considered borderline or below average for his age group. *Id.* The test confirmed that Plaintiff is able to do simple addition and subtraction, multiplication, and division of whole numbers. *Id.* Mr. Shapiro opined that these test results indicate that Plaintiff "has limited functional use of reading and basic arithmetic skills for use in a variety of entry level, unskilled occupational areas." *Id.*

Mr. Shapiro reported Plaintiff scored in the average range of the Standard Raven Progressive Matrices Test, and opined that Plaintiff has the "potential for occupations requiring nonverbal problem-solving skills of an abstract nature." AR at 442. Mr. Shapiro further reported that Plaintiff scored below average on the Oral Directions Test ("ODT"), but that Plaintiff "demonstrated the ability to follow simple verbal instructions with demonstrations." *Id.* Mr. Shapiro also reported that Plaintiff "scored in the below average range for fine finger and hand dexterity." *Id.* Mr. Shapiro stated that this result indicates that Plaintiff "has poor potential for jobs requiring the rapid manipulation of small tools, instruments, and objects, such as assembly line work or jobs requiring a quota system." *Id.* Mr. Shapiro stated that Plaintiff "scored in the below average range for time and in the average range for errors" on the Minnesota Spatial Relations Test which "assess visualization ability, accurate perception of spatial relations, and rapid manipulation of three-dimensional objects." *Id.* at 443. Mr. Shapiro noted that Plaintiff had some apparent discomfort standing. AR at 443.

Mr. Shapiro administered work samples to Plaintiff, who scored in the below average range for time without errors in the Valpar #2 Size Discrimination Work Sample, and in the below average range for overall performance in the Valpar #8 Simulated

Assembly Work Sample. *Id.* at 443–44. Mr. Shapiro reported that Plaintiff was able to sit for approximately forty-five (45) minutes to an hour before needing a break and could stand for approximately twelve (12) minutes before needing to sit down. *Id.* at 444–45.

Mr. Shapiro reported that Plaintiff was friendly, casual but appropriately groomed, and interacted appropriately. *Id.* at 445. Mr. Shapiro further reported that Plaintiff's "communication skills in relation to work needs were considered to be fair to good." *Id.* at 446. Mr. Shapiro opined that "[b]ased on the academic test results administered during the evaluation, [Plaintiff] has an approximate Reasoning level of 3; an approximate Math level of 2; and an approximate Language level of 2." AR at 448.

### 3. Plaintiff's Medical Records

On October 21, 2008, Plaintiff saw Don H. Carlson, D.O. regarding "high blood pressure, cholesterol and leg spasms [which are] worse at night." AR at 277–80. Plaintiff reported being unable to stay awake after eating, feeling very thirsty, and drinking a lot of soda. *Id.* at 277. Plaintiff also complained of body aches all over, with sharp pains in his hands and arms. *Id.* Plaintiff's wife reported that Plaintiff snores at night and stops breathing, she has to nudge him to wake up and hears him gasping for air. *Id.* Plaintiff also reported congestion at bedtime and trouble sleeping. *Id.* Plaintiff indicated that when he wakes up at night, he goes straight to the refrigerator and eats. AR at 277. Dr. Carlson's physical review of Plaintiff was otherwise unremarkable. *Id.* at 278. Dr. Carlson assessment of Plaintiff included benign essential hypertension, esophageal reflux, hyperlipidemia, sleep apnea, and Restless Leg Syndrome. *Id.* at 279.

On January 6, 2009, Plaintiff underwent a sleep study. *See* AR at 276, 281–85.

Plaintiff had previously undergone a sleep study on December 2, 2008. *Id.* at 281. The January 2009 study confirmed the previous diagnosis of severe obstructive sleep apnea syndrome. *Id.* at 276, 281. Plaintiff "appeared to tolerate CPAP poorly[.]" *Id.* at 281.

On February 5, 2009, Plaintiff saw Dr. Carlson for follow-up regarding lab work and a sleep study. AR at 273–75. Plaintiff reported "feel[ing] tired due to lack of sleep and fall[ing] asleep through out [sic] the day." *Id.* at 273. Dr. Carlson indicated that Plaintiff did not have heartburn, nausea, diarrhea, constipation, or and bowel or bladder changes. *Id.* Dr. Carlson's review of Plaintiff's systems was unremarkable, except for "[t]enderness was elicited [on Plaintiff's] [right] forearm[,] no swelling." *Id.* at 274. Dr. Carlson assessed hyperlipidemia, nicotine dependence, sleep apnea, and recent diverticulitis. *Id.*

On May 13, 2009, Plaintiff saw Dr. Carlson for a follow-up regarding his hypertension and lipids. AR at 271–72.

On June 29, 2009, Plaintiff saw Joe M. Huerta, M.D. at Tucson ENT Associates, PC for a consultation regarding a "significant right sided nasal obstruction with about 95 percent blockage." AR at 267, 287. Plaintiff had undergone a sleep study that showed he needed a CPAP, but Plaintiff opted for surgery. *Id.* at 267, 287. Dr. Huerta recommended a septoplasty. *Id.* at 267, 287.

On July 19, 2009, Plaintiff again saw Dr. Huerta and underwent a nasal septoplasty. AR at 259–60, 266. On July 21, 2009, Plaintiff returned to Dr. Huerta for a postoperative check. *Id.* at 264, 288. Dr. Huerta noted that Plaintiff did "a good job recovering." *Id.* at 264, 288.

- 9 -

1

2          On October 1, 2009, Plaintiff returned to Dr. Huerta regarding his snoring and

3     sleep apnea. AR at 263, 290. Dr. Huerta noted that Plaintiff was using a CPAP and was

4     "going through a divorce and . . . gaining a considerable amount of weight." *Id.* at 263,

5     290. Dr. Huerta advised Plaintiff to work on weight reduction and then follow-up. *Id.* at

6     263, 290.

7          On July 10, 2012, Plaintiff was referred to Guy C. Cary III, M.D. for further input

8

9     regarding Plaintiff's dyslexia; four (4) to five (5) month history of "apparent spontaneous

10    onset of stiffness in the left hemi-nuchal region;" intermittent low back pain; and leg pain

11    with a burning feeling when he walks. AR at 336–39. Plaintiff described the pain in his

12

13    hemi-nuchal region as 6 out of 10 in intensity, spreading to his left shoulder and

14    intermittently down the posterior arm and dorsolateral forearm. *Id.* at 336. Plaintiff also

15    described his intermittent radiating low back pain as 6 out of 10 in intensity. *Id.* Dr.

16

17    Cary noted Plaintiff's additional past medical history of hypertension; diabetes mellitus;

18    sleep apnea; acid reflux; status post ENT procedure; history of diverticulitis; status post

19    colectomy in which 2 feet of the intestine was removed; and status post herniorrhaphy.

20

21    *Id.* at 336–37. Dr. Cary's review of Plaintiff's systems was unremarkable, as was

22    Plaintiff's physical examination, except for spasm in Plaintiff's cervical paraspinal

23    muscles and continuing into the shoulders. *Id.* at 337–38. Dr. Cary also noted a positive

24

25    Spurling sign on the left, spasm in the lumbar paraspinal musculature, and straight leg

26    raising equivocally positive bilaterally. AR at 339. Dr. Cary's impression included

27    irritative cervical and lumbar radiculopathy, myofascial pain syndrome, and dyslexia per

28    history. *Id.* Dr. Cary gave Plaintiff neck and low back exercises and a water aerobics

form, as well as booklets regarding his neck and back; requested C-spine report; ordered lumbosacral spine and bilateral hip films; ordered a nerve conduction study; ordered physical therapy focusing on the neck, shoulders, and low back; ordered a TENS unit for the cervical radiculopathy: and ultrasound treatment.  *Id.*  On July 23, 2012, Plaintiff underwent a nerve conduction study/EMG.  *Id.* at 335.   The electrophysiological examination was normal.  *Id.*  On July 31, 2012, Plaintiff underwent a lumbar spine imaging.   The L5-S1 disc was narrowed with "extremely tiny anterior L4-5 and S1 spurs[,] . . . [and] a tiny posterior L5 spur[,] . . . [and] minimal posterior articular facet sclerosis at L5-S1."  *Id.* at 342, 359, 377.  On this same date, Plaintiff had bilateral hip films taken.  AR at 358, 378.  Acute abnormalities were absent, and the bilateral films were unremarkable.  *Id.* at 358, 378.  On August 6, 2012, Plaintiff enrolled in Corazón for mental health services.  *Id.* at 437.

On September 8, 2012, Plaintiff was evaluated by Sloan King, Ph.D.  AR at 296–307.  Dr. King administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) to Plaintiff.  *Id.* at 296.  Dr. King opined that Plaintiff's "nonverbal reasoning abilities are much better developed than his verbal reasoning abilities."  *Id.*  Dr. King reported Plaintiff's "verbal reasoning abilities as measured by the Verbal Comprehension Index (VCI) are in the low average range and above those of only 9% of his peers[.]"  *Id.*  Dr. King further noted diversity in Plaintiff's VCI verbal abilities.  *Id.* at 296–97.  Dr. King reported Plaintiff's "nonverbal reasoning abilities as measured by the Perceptual Reasoning Index (PRI) are in the average range and above those who are approximately 39% of his peers[.]"  AR at 297.  Dr. King also reported that Plaintiff's "ability to sustain

attention, concentrate, and exert mental control is in the low average range . . . [and] [h]e performed better than approximately 9% of his peers in this area (Working Memory Index)[.]" *Id.* Plaintiff's "ability in processing simple or routine visual materials without making errors is in the borderline range . . . [and] [h]e performed better than approximately 8% of his peers on the Processing Speed task[.]" *Id.* Dr. King summarized Plaintiff's WAIS-IV performance noting that to do so was difficult "because [Plaintiff's] nonverbal reasoning abilities are much better developed than hi verbal reasoning abilities." AR at 298. Dr. King determined that Plaintiff's "Full Scale score places him in the *Borderline Range of Intellectual Functioning*." *Id.* (emphasis in original). Dr. King reviewed Plaintiff's educational, work, and health histories as reported to him by Plaintiff and a review of forms completed for the disability application process, including a report by his mother, Guadalupe Soza. *Id.* at 298–303. Dr. King's diagnostic impressions and summary included:

> Axis I:      Adjustment Disorder with Mixed Anxiety and Depressed Mood, and a history of learning disabilities.
>
> Axis II:     Borderline intellectual functioning.
>
> Axis III:    Health issues reported by Plaintiff including diverticulitis, sleep apnea, hypertension, Type 2 diabetes (non-Insulin dependent), muscle pain, restless leg syndrome, and a history of abdominal surgery.
>
> Axis IV:     Occupational problems, problems with primary support group, legal involvement, financial problems, and inadequate access to health care services.
>
> Axis V:      Current GAF: 55 (70 in the past year).

*Id.* at 303. Dr. King also completed a Psychological/Psychiatric Medical Source Statement in which he opined that he did not expect any limitations to last twelve (12)

continuous months from the date of his examination.  *Id.* at 304.  Dr. King opined that Plaintiff "should have no difficulty remembering locations and work-like procedures, as well as understanding and comprehending more detailed instructions."  AR at 305.  Dr. King further opined that Plaintiff "appears to be mildly limited with regard to his ability to complete a normal work day and work week without interruption from psychologically-based symptoms as well as his reported issues relative to physical health."  *Id.*  Dr. King, found Plaintiff's prognosis to be good if he continued to receive mental and physical health services.  *Id.*  Dr. King found Plaintiff to "demonstrate[] very good interpersonal skills and [that he] should have no difficulty getting along with others."  *Id.*  Dr. King further reported that Plaintiff has "the ability to travel in unfamiliar places, . . . utilize public transportation[,] . . . [and] appears to demonstrate the ability to set realistic goals, as well as make plans independently of others."  *Id.*  Finally, Dr. King opined that Plaintiff is capable of managing his own benefit payments.  AR at 305.

On September 30, 2012, Jeri B. Hassman, M.D. evaluated Plaintiff for an Internal Medicine Consultation and Statement of Ability to Do Work-Related Activities.  AR at 308–14.  Dr. Hassman performed a physical examination with Plaintiff providing his medical history, and no records were reviewed.  *See id.* at 308.  A review of Plaintiff's systems indicated occasional neck pain, frequent low back pain, and occasional headaches.  *Id.* at 309.  Dr. Hassman reported that Plaintiff reported occasional abdominal pain and occasional nausea and denies diarrhea or constipation.  *Id.*  Plaintiff denied visual problems, hearing problems, chest pain, rib pain, or shortness of breath.  *Id.*  Plaintiff complained of occasional dizziness and confusion and frequent fatigue, as well

as waking up several times at night.  AR at 309.  Plaintiff also complained of severe

depression and anxiety.  *Id.*  Plaintiff denied any numbness or tingling of his arms, hands,

fingers, legs, feet, or toes, as well as any urinary symptoms.  *Id.*  Dr. Hassman reported

that Plaintiff's gait was normal and symmetric, he was able to stand and walk on his toes

and heels, and tandem walk.  *Id.*  Plaintiff was able to hop on either foot and bend down

to pick up something from the floor.  *Id.*  Dr. Hassman further reported that Plaintiff was

able to kneel down on either knee, and was independent in dressing and undressing, as

well as getting on and off the examining table and in and out of the chair.  AR at 309.  Dr.

Hassman examination of Plaintiff's head and neck was normal, with cranial nerves intact,

supple neck, and a full range of motion of the cervical spine without pain and no

tenderness over the cervical muscles.  *Id.*  Dr. Hassman confirmed Plaintiff's status post

uvulopalatopharyngoplasty.  *Id.*  Dr. Hassman further reported no respiratory distress,

with normal breath sounds and clear lungs bilaterally.  *Id.*  Dr. Hassman also reported a

normal abdominal examination.  *Id.*  Dr. Hassman noted a full range of motion of both

upper extremities without pain; no swelling, warmth, or tenderness of the shoulders,

elbows, wrists, or fingers; a negative Phalen's test; negative Finkelstein's test; a negative

Tinel's sign of both anterior wrists and medial elbows; normal coordination of the fingers

and normal serial finger tapping of each finger to the ipsilateral thumb; and normal

neurological examination of both upper extremities.  AR at 310.  Dr. Hassman reported

Plaintiff's right grip strength was 38 kilograms, and left grip strength was 28–29

kilograms with normal fine motor dexterity and fine motor coordination of both hands,

exhibited no difficulty picking up small objects, without tremor, and negative Romberg's

sign.  *Id.*  Plaintiff's thoracic and lumbar spine was straight and nontender, without evidence of muscle spasm or hypertonicity of the paraspinal muscles.  *Id.*  Plaintiff had a full range of motion of his lumbar spine without pain, and a negative straight leg test bilaterally in both sitting and supine positions.  *Id.*  Plaintiff exhibited a full range of motion of both lower extremities without pain, and without swelling, warmth, or tenderness of the hips, knees, or ankles.  *Id.*  Plaintiff did not have any crepitus or instability of the knees or ankles or any atrophy, tenderness, or edema of either lower leg. AR at 310.  Dr. Hassman reported that neurological examination of both lower extremities revealed normal motor strength, sensation, and reflexes.  Dr. Hassman diagnosed a history of obstructive sleep apnea, with continuing symptoms and daily fatigue post uvulopalatopharyngoplasty; a history of learning disability; status post partial colectomy for diverticulosis/diverticulitis; and Type 2 diabetes mellitus, currently off Metformin.  *Id.*  Dr. Hassman's medical source statement completed on the same date indicated that Plaintiff's conditions would not impose any limitations for twelve (12) continuous months.  *Id.* at 311.

On October 4, 2012, Plaintiff returned to Dr. Cary for a follow up.  AR at 332–34. Dr. Cary noted that Plaintiff's C-spine showed some degenerative disc changes, particularly in the lower cervical spine; however, the lumbosacral spine and bilateral hip films were both unremarkable.  *Id.* at 332.  Dr. Cary's neurological examination of Plaintiff was generally unremarkable, except for spasm throughout the paraspinal musculature.  *Id.* at 332–33.  Again, Dr. Cary noted a positive Spurling sign on the left and straight leg raising equivocally positive bilaterally.  *Id.* at 333.  Additionally, Dr.

Cary noted facet tenderness in the mid and low lumbar region, with hip hyperflexion and internal hip rotation both bilaterally positive. *Id.* Dr. Cary's impressions included irritative cervical and lumbar radiculopathy, lumbar facet syndrome, myofascial pain syndrome, and dyslexia. AR at 333. Dr. Cary recommended continuing neck and low back exercises and water aerobics, continued physical therapy, continued use of TENS unit, and ultrasound treatment to the neck shoulders, and low back. *Id.*

On November 2, 2012, Plaintiff saw Dr. Wu complaining of pain in his left big toe. AR at 357. Dr. Wu noted positive findings regarding headaches and back pain. *Id.* On November 29, 2012, Plaintiff was seen at Corazón. *Id.* at 434–36. Plaintiff reported low energy and persistent anxiety. *Id.* at 434.

On December 3, 2012, Plaintiff followed up with Dr. Wu regarding his headaches, breathing trouble, and back pain. AR at 356. Dr. Wu's assessment included headaches, allergic rhinitis, sleep apnea, back pain, and joint pain. *Id.* On December 5, 2012, Plaintiff saw Dr. Cary for a follow up. AR at 329–31. Plaintiff reported pain intensity of 5 out of 10 in the left low lumbosacral region. *Id.* at 329. Dr. Cary's neurological examination of Plaintiff was generally unremarkable, except for an antalgic gait, and a trigger point tender to palpation around the left sacroiliac joint. *Id.* at 330. Additionally, Plaintiff had a positive Fortin sign on the left. *Id.* Dr. Cary's impression included myofascial pain syndrome with trigger point; left sacroiliitis; lumbar facet syndrome; and irritative lumbar and cervical radiculopathy. *Id.* Dr. Cary recommended that Plaintiff continue with physical therapy and TENS unit; receive a trigger point injection of the left sacroiliac joint, to which Plaintiff agreed and received; and ultrasound

treatment to low back.  AR at 330.  On December 29, 2012, Plaintiff returned to Dr. Wu for a referral for physical therapy and a refill for his anxiety medication.  *Id.* at 354.

On January 6, 2013, Plaintiff was seen in the Southeast Arizona Medical Center Emergency Room for fever.  AR at 396–405.  Plaintiff also complained of pain at 8 out of 10, with 10 being the worst pain.  *Id.* at 396.  Plaintiff tested positive for Influenza B and was given Tylenol and Tamiflu, then discharged home.  *Id.* at 396–98, 402.  On January 10, 2013, Plaintiff saw Ulker Tok, M.D. for a rheumatology consultation.  AR at 363–64.  Dr. Tok's review of Plaintiff's systems indicated weight gain, fatigue, weakness, leg spasms, hoarseness, high blood pressure, shortness of breath, wheezing, headaches, dizziness, nasal congestions, depression, lower abdominal pain, and dry mouth.  *Id.* at 363.  Dr. Tok's physical examination of Plaintiff was generally unremarkable, but found pain on lateral bending C-spine, pain on range of motion in the left shoulder, straight leg raise elicited left posterior thigh pain, and hands were mildly tender on metacarpophalangeal joints.  *Id.* at 364.  Dr. Tok's assessment included myofascial neck and left shoulder pain, a mild rotator cuff tendinitis in the left shoulder, chronic lower back pain and intermittent left sciatica, myalgias, cramps, and paresthesias in his legs.  *Id.*  Plaintiff also had blood work performed on this same date.  *Id.* at 370–73. On January 16, 2013, Plaintiff returned to Dr. Cary for a follow up.  AR at 327–329. Plaintiff again reported pain intensity of 5 out of 10 in his neck, shoulders, and low back. *Id.* at 327.  Dr. Cary's neurological examination of Plaintiff was generally unremarkable, except for an antalgic gait and positive Fortin sign on the left.  *Id.* at 327–28.  Dr. Cary's impressions included myofascial pain syndrome; left sacroiliitis, improved since

Plaintiff's previous appointment; lumbar facet syndrome; and irritative lumbar and cervical radiculopathy.  *Id.* at 328.  Dr. Cary recommended that Plaintiff continue with physical therapy and the TENS unit, obtain a lumbosacral MRI, and ultrasound treatment to the neck, shoulders, and low back.  *Id.* at 328.  Dr. Cary did not perform a trigger point injection, because Plaintiff was under the weather.  *Id.*  On January 17, 2013, Plaintiff saw Dr. Wu regarding his lower back pain.  AR at 353.  Dr. Wu's assessment included lower back pain, recent headaches, and anxiety.  *Id.*  On January 31, 2013, Plaintiff was seen at Corazón.  AR at 431–33.  Plaintiff reported sleeping during the day, with interrupted sleep at night which results in pacing, walking, and eating at night.  *Id.* at 431.

On February 5, 2013, Plaintiff underwent a nerve conduction study/EMG.  AR at 326.  Plaintiff's electrophysiological examination was again normal.  *Id.*  On February 8, 2013, Plaintiff returned to Dr. Cary for a follow up.  AR at 322–25.  Plaintiff reported a 6 out of 10 pain intensity in the low lumbosacral regions bilaterally.  *Id.* at 322.  Dr. Cary's neurological examination of Plaintiff was generally unremarkable, except for an antalgic gait, and facet tenderness bilaterally in the low lumbar region.  *Id.* at 323.  Plaintiff also exhibited a positive Fortin sign on the left, and hip hyperflexion and internal hip rotation were both bilaterally positive.  *Id.*  Dr. Cary's impression included lumbar facet syndrome; left sacroiliitis; myofascial pain syndrome; and irritative lumbar and cervical radiculopathy.  *Id.*  Dr. Cary recommended that Plaintiff continue with physical therapy and the TENS unit, proceed with a lumbosacral MRI, and bilateral L5-S1 lumbar facet medial branch blocks.  AR at 323.  Dr. Cary utilized C-arm fluoroscopy to perform the bilateral L5-S1 lumbar facet medial branch block.  *Id.* at 324.  Plaintiff reported a pain

level of 0 out of 10 after the block.  *Id.* at 325.  On February 13, 2013, Plaintiff underwent an MRI lumbar spine without contrast.  *Id.* at 340–41, 392–93.  The MRI findings were generally unremarkable except for "[b]road-based posterior disc protrusion, moderate bilateral facet disease, and mild disc height loss at the L5-S1 level contributing to mild to moderate left and nominal right neuroforaminal narrowing without significant central canal stenosis."  *Id.* at 341, 393.  On February 18, 2013, Plaintiff saw Dr. Wu for medication management for diabetes and anxiety.  *Id.* at 352.

On March 5, 2013, Plaintiff was seen in the Southeast Arizona Medical Center Emergency Room complaining of headache and nausea.  AR at 382–90.  Plaintiff rated his pain as 7 out of 10, with 10 being the worst pain imaginable.  *Id.* at 383.  Plaintiff was given Demerol and Phenergan for pain and sent home.  *Id.* at 384.  Plaintiff also received a head CT on this same date.  *Id.* at 391.  The Ct showed no acute intracranial abnormality.  *Id.*  On March 7, 2013, Plaintiff followed up with Dr. Cary for chronic migraine headaches, lumbar facet syndrome, left sacroiliitis, myofascial pain syndrome, irritative cervical and lumbar radiculopathy, and per Plaintiff's report dyslexia.  AR at 319–21.  Plaintiff reported a flare-up in his chronic migraine headaches.  *Id.* at 319.  Dr. Cary's examination was unremarkable, except a spasm palpated throughout the paraspinal musculature.  *Id.* at 319–20.  Dr. Cary recommended continued use of the TENS unit; reviewed Plaintiff's December 13, 2013 lumbosacral MRI, noting that it "was remarkable for broad-based L5-S1 disc protrusion"; requested old records to be sent to his office; prescribed Topamax for headaches and Zanaflex, a muscle relaxant; gave Plaintiff samples and a prescription for Maxalt-MLT 10 mg for headache; and performed

an ultrasound treatment to neck, shoulders, and low back, followed by spray and stretch treatment.  *Id.* at 320–21.  On March 18, 2013, Plaintiff again saw Dr. Wu regarding his anxiety medication.  *Id.* at 351.  Plaintiff returned to Dr. Wu on March 26, 2013 regarding his lower back pain, bilateral lower leg pain, and anxiety.  *Id.* at 350.  On March 27, 2013, Plaintiff again followed up with Dr. Cary.  AR at 316–18.  Dr. Cary reported that Dr. Wu had discontinued all of Plaintiff's medications (including those prescribed by Dr. Cary).  *Id.* at 316.  Plaintiff complained of gastric hypomotility and hypogastric pain.  *Id.*  Dr. Cary's examination of Plaintiff was unremarkable except for a Fortin sign present on the left side, with spasm palpated throughout the paraspinal musculature.  *Id.* at 317.  Dr. Cary's impressions included chronic migraine headaches, lumbar facet syndrome, left sacroiliitis, myofascial pain syndrome, irritative cervical and lumbar radiculopathy, and, per history, dyslexia.  *Id.*  Dr. Cary recommended continued use of the TENS unit; requested old records to be sent to his office, remain off Topamax and Zanaflex; provided Plaintiff with samples of Relpax 40 mg for his headaches while trying to obtain prior authorization for Maxalt; referral for a gastroenterology evaluation; and an ultrasound treatment to neck, shoulders, and low back, followed by spray and stretch treatment.  AR at 317–18.

On April 2, 2013, Dr. Wu performed an ingrown toenail removal on Plaintiff.  *Id.* at 347–49.  On April 16, 2013, Plaintiff was referred to Jaya H. Maddur, M.D. for his heartburn and nausea.  AR at 412–13.  Dr. Maddur reported that Plaintiff denied any malaise or fatigue, or any headaches, but indicated that his hypertension was well controlled with medication, and that he took several different narcotics for arthritis pain

control.  *Id.* at 412.  Dr. Maddur's physical examination of Plaintiff was unremarkable. *Id.*  Dr. Maddur diagnosed Plaintiff with acid reflux disease, but noted that a Barrett's esophagus and non-healing ulcer needed to be ruled out.  *Id.* at 413.  On April 17, 2013, Plaintiff saw Dr. Wu for a regular appointment.  *Id.* at 346.  Dr. Wu assessed lower back pain, bilateral lower leg pain, and anxiety.  *Id.*  On April 30, 2013, Plaintiff underwent an ultrasound of his right lower extremity because of swelling.  *Id.* at 379.  The results were negative for right lower extremity deep venous thrombosis.  *Id.*

On May 3, 2013, Plaintiff was seen at Corazón.  AR at 429–30.  Plaintiff reported that Trazadone triggers his migraine headaches.  *Id.* at 429.  Plaintiff further reported significant weight gain since starting at Corazón.  *Id.*  Plaintiff also reported that he continued to struggle with anxiety and sleep disturbance.  *Id.*  On May 7, 2013, Plaintiff followed up with Laura S. Brown, M.D. regarding his pain medication.  AR at 345.  Dr. Brown assessed chronic low back and cervical pain, bilateral leg pain, including upper calf pain, anxiety, and diabetes.  *Id.*  On May 7, 2013, Plaintiff followed up with Dr. Wu regarding his lower back and leg pain and referral to Dr. Tok.  *Id.* at 344.  On May 8, 2013, Plaintiff saw Dr. Tok for a follow-up.  *Id.* at 365–66.  Physical examination was unremarkable, except Plaintiff's knees, ankles, and shoulders were tender.  *Id.* at 366.  On May 13, 2013, Dr. Maddur performed an Esophagogastroduodenoscopy on Plaintiff.  AR at 410–11.  Dr. Maddur obtained multiple biopsies and noted gastritis, duodenitis, and duodenal erosions.  *Id.* at 410.

On June 4, 2013, Plaintiff saw Dr. Maddur for a follow-up after a recent endoscopy.  AR at 409.  Dr. Maddur reported that Plaintiff was being treated for H-Pylori

and had not yet completed the course of antibiotics.  *Id.*  On June 18, 2013, Plaintiff underwent a colonoscopy performed by Dr. Maddur; however, the examination was incomplete.  AR at 408.  On July 12, 2013, Plaintiff underwent another colonoscopy, this time performed by Charles Krone, M.D.  AR at 407.  Dr. Krone reported that the colon itself was normal, but noted internal and external hemorrhoids excoriation.  *Id.*

On September 5, 2013, Plaintiff continued treatment through Corazón "to learn to be a better parent for his twin 5 year old girls."  AR at 420.  Plaintiff also indicated a desire for assistance with his anxiety.  *Id.*

On October 1, 2013, Plaintiff returned to Dr. Tok for a follow-up regarding his rheumatoid arthritis.   AR at 367–68.   Physical examination of Plaintiff was unremarkable, except for tenderness in his shoulders, knees, ankles, and fore feet.  *Id.* at 368.  Dr. Tok's impressions included rheumatoid arthritis, Sjogren's Syndrome, and Syst Lupus Erythematosus.  *Id.*  Plaintiff also had blood work performed on this same date.  *Id.* at 369.   On October 10, 2013, Plaintiff saw Dr. Maddur for a follow up after a colonoscopy.  *Id.* at 406.  Dr. Maddur noted Plaintiff has acid reflux, but is doing well with omeprazole, and recommended an ultrasound of the lower abdomen to evaluate his chronic pain in the groin area.  *Id.*

On March 23, 2014, Plaintiff  again saw Jeri B. Hassman, M.D. for an Internal Medicine Consultation.   AR at 450–62.   Dr. Hassman reviewed Plaintiff's medical records, noting Plaintiff's recent rheumatoid arthritis, lupus, and Sjogren's syndrome diagnoses.  *Id.* at 451.  Dr. Hassman reported that Plaintiff has occasional neck, left shoulder, and low back pain, as well as pain in the left buttock and hip area.  *Id.* at 452.

Plaintiff further reported occasional headaches, nausea, and chest pain with frequent fatigue and occasional shortness of breath. *Id.* Plaintiff further reported frequent depression and anxiety and occasional dizziness. *Id.* Dr. Hassman's physical examination of Plaintiff was unremarkable, except for "minimal pain with range of motion of the left shoulder and minimal pain with impingement testing left shoulder[,] . . . [and] minimal tenderness over the left proximal forearm and no tenderness over the right proximal forearm." AR at 452–53. Dr. Hassman noted that Plaintiff had a "full range of motion of both shoulders, elbows, and wrists . . . [and] normal manual dexterity and normal fine motor coordination of the fingers[,] . . . Plaintiff's [r]ight grip strength was 28 kilograms and left grip strength was 6 kilograms." *Id.* at 453. Dr. Hassman further reported that there was no evidence of "muscle spasm or hypertonicity of the paraspinal muscles" and that Plaintiff had a "full range of motion of the lumbar spine without pain." *Id.* Dr. Hassman also reported "[s]traight leg raising test was negative bilaterally in both sitting and supine positions." *Id.* Dr. Hassman completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) in this matter. *Id.* at 454–62. Dr. Hassman opined that Plaintiff could occasionally lift up to ten (10) pounds, occasionally lift eleven (11) to twenty (20) pounds, and occasionally lift twenty-one (21) to fifty (50) pounds, but never lift more than fifty (50) pounds. *Id.* at 454–55. Dr. Hassman further opined that Plaintiff could occasionally carry up to twenty (20) pounds, but never more than that. AR at 455. Dr. Hassman stated that without interruption Plaintiff could sit for two hours, stand for one hour, and walk for thirty (30) minutes. *Id.* Dr. Hassman further stated that in an eight (8) hour work day, Plaintiff

could sit for eight (8) hours, stand for three (3) hours, and walk for two (2) hours.  *Id.*  Dr.

Hassman reported that Plaintiff did not need a cane to ambulate.  *Id.*  Dr. Hassman opined

that with his right hand, Plaintiff could frequently reach (overhead and otherwise) and

push-pull, and continuously handle, finger, and feel.  *Id.* at 457.  Dr. Hassman further

opined that with his left hand, Plaintiff could occasionally reach (overhead and

otherwise) and push-pull, and continuously handle, finger, and feel.  AR at 457.  Dr.

Hassman also opined that Plaintiff could frequently operate foot controls with either his

right or his left foot.  *Id.* at 457–58.  Dr. Hassman indicated that Plaintiff could

occasionally climb stairs and ramps; climb ladders or scaffolds; balance, crouch; or

crawl, and frequently stoop or kneel.  *Id.* at 458.  Dr. Hassman stated that Plaintiff should

never be exposed to unprotected heights; operating a motor vehicle; dust, odors, fumes,

and Pulmonary irritants; extreme cold; extreme heat; or vibrations.  *Id.* at 459.  Dr.

Hassman further stated that Plaintiff could occasionally be exposed to moving

mechanical parts and humidity and wetness; and frequently be exposed to noise.  *Id.* at

459–60.  Dr. Hassman opined that Plaintiff can shop; travel without a companion for

assistance; ambulate without using a wheelchair, walker, or two (2) canes or crutches;

walk a block at a reasonable pace on rough or uneven surfaces; climb a few steps at a

reasonable pace with the use of a single hand rail; prepare a simple meal and feed

himself; and sort, handle or use paper files.  AR at 460.  Dr. Hassman's diagnosis

included a history of obstructive sleep apnea and status post uvulopalatopharyngoplasty

("UVPP"); a history of learning disability; status post colectomy for treatment of

diverticulitis; a history of type 2 diabetes mellitus; a "[r]ecent diagnosis of inflammatory

polyarthropathy including 'lupus, rheumatoid arthritis and Sjogren's syndrome' according to rheumatology consults" and "minimal pain with left shoulder range of motion and physical exam is consistent with rotator cuff tendonitis[;]" and obesity. *Id.* at 461.

## II.    STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error.   42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).   This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."   *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).   Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).   Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d

1149, 1152 (9th Cir. 2007).  Moreover, the court may not focus on an isolated piece of

supporting evidence, rather it must consider the entirety of the record weighing both

evidence that supports as well as that which detracts from the Secretary's conclusion.

*Tackett*, 180 F.3d at 1098 (citations omitted).

## III.    ANALYSIS

### A.        *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess

whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as

follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the

claimant is not disabled; step two considers if the claimant has a "severe medically

determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step

three determines whether the claimant's impairments or combination thereof meet or

equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is

not disabled; step four considers the claimant's residual functional capacity and past

relevant work.  If claimant can still do past relevant work, then he or she is not disabled;

step five assesses the claimant's residual functional capacity, age, education, and work

experience.  If it is determined that the claimant can make an adjustment to other work,

then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements

of the Social Security Act through September 30, 1990, and was not engaged in

substantial gainful activity since his alleged onset date of January 1, 1990.  AR at 21.  At

step two of the sequential evaluation, the ALJ found that "the claimant has the following severe impairments: obstructive sleep apnea status post uvulopalatopharyngoplasty, diverticulitis, diabetes, inflammatory polyarthropathy, obesity, degenerative disc disease of the lumbar spine, adjustment disorder with mixed anxiety and depressed mood, borderline intellectual functioning, and learning disorder (20 CFR 404.1520(c) and 416.920(c))." *Id.* At step three, the ALJ found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926)." *Id.* at 22.  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(c) and 416.967(a) except he can sit six hours; stand and walk two hours each; lift and/or carry 10 pounds occasionally and frequently; reach frequently bilaterally; and perform only simple, repetitive tasks."  AR at 24.  At step four, the ALJ found that "[t]he claimant has no past relevant work (20 CFR 404.1565 and 416.965)."  *Id.* at 31.  Relying on the Medical-Vocational Guidelines Rule 202.17 as a "framework" at step five (5), the ALJ found that Plaintiff was not disabled.  *Id.* at 32.  In making this determination, the ALJ did not use vocational expert testimony, and gave little weight to the vocational evaluations procured by the claimant's representative.  *See id.* at 30–32.  The ALJ found that "the additional limitations have little or no effect on the occupational base of unskilled sedentary work."  *Id.* at 32.  Accordingly, the ALJ determined that Plaintiff was not disabled.  *Id.*

Plaintiff asserts that the ALJ erred by 1) failing to obtain Vocational Expert testimony at Step 5; 2) failing to evaluate non-examining psychiatrist Dr. Nathan's opinion; 3) failing to properly evaluate Dr. Hassman's March 2014 opinion; and 4) failing to properly evaluate Plaintiff's education level.  Pl.'s Opening Br. (Doc. 15) at 7–23.

### B.   Examining Physician Jeri Hassman, M.D.

Plaintiff asserts that the ALJ "erroneously rejected Dr. Hassman's opinion that Daniel could reach with his left hand only occasionally."  Pl.'s Opening Br. (Doc. 15) 19–20.  Conversely, the Commissioner argues that the ALJ "reasonably rejected Dr. Hassman's opinion because the record as a whole did not support a limitation to only occasional reaching with the left hand."  Def.'s Response (Doc. 20) at 18.

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)).  "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record."  *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157

F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007);

*Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).   Similarly, "[t]he opinion of an

examining physician is, in turn, entitled to greater weight that the opinion of a

nonexamining physician." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (citations

omitted).   "As is the case with the opinion of a treating physician, the Commissioner

must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of

an examining physician." *Id.* (citations omitted).   Furthermore, "like the opinion of a

treating doctor, the opinion of an examining doctor, even if contradicted by another

doctor, can only be rejected for specific and legitimate reasons that are supported by

substantial evidence in the record."   *Id.* at 830–31 (citations omitted).   "[T]he more

consistent an opinion is with the record as a whole, the more weight we will give to that

opinion."   20 C.F.R. § 404.1527(c)(4).   Additionally, "[t]he opinion of a nonexamining

physician cannot by itself constitute substantial evidence that justifies the rejection of the

opinion of either an examining physician *or* a treating physician."   *Lester*, 81 F.3d at 831

(citations omitted).

   The ALJ provided a detailed and thorough summary of the medical evidence, then

concluded that "Dr. Hassman's opinion from the second examination is only given partial

weight as the evidence does not support environmental limitations or occasional reaching

with the left hand."   AR at 28.   "The ALJ must do more than state conclusions. [She]

must set forth [her] own interpretations and explain why they, rather than the doctor's are

correct."   *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citations omitted).   The

ALJ did not do so here, and as such, failed to set forth "specific and legitimate" reasons

supported by "substantial evidence in the record" for her dismissal of Dr. Hassman's opinions.  *See, e.g., Rollins*, 261 F.3d at 856.  As an initial matter, Plaintiff's treating physician Dr. Tok assessed mild rotator cuff tendinitis.  AR at 364.  Moreover, despite the Commissioner's argument to the contrary, Dr. Hassman did diagnose Plaintiff with "minimal pain with left shoulder range of motion and physical exam [] consistent with rotator cuff tendonitis." *Id.* at 453, 461.  Additionally, the contradictory opinion put forth by the Commissioner is an "opinion of a nonexamining physician [which] cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831 (citations omitted).  Neither did the ALJ state "specific and legitimate" reasons for rejecting Dr. Hassman's environmental limitations.  *See* AR at 28.  As such, the Court finds that the ALJ improperly discounted Dr. Hassman's opinions.

### C.    *Vocational Expert Testimony*

"Because the ALJ failed to provide adequate reasons for rejecting Dr. Hassman's opinion, we credit it as a matter of law." *Widmark v. Barnhart*, 454 F.3d 1063, 1069 (9th Cir. 2006) (citations omitted).  "Doing so makes the ALJ's use of the Medical-Vocational Guidelines to determine [Plaintiff's] ability to adjust to other work reversible error." *Id.* "A non-exertional impairment, if sufficiently severe may limit the claimant's functional capacity in ways not contemplated by the guidelines." *Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999) (quotation and citation omitted).  "Examples of non-exertional limitations are pain, postural limitations, or environmental limitations." *Id.* (citations omitted).  "Because [Plaintiff] suffers from non-exertional limitations not contemplated

by the grids, the ALJ was required at step five to call upon a vocational expert to establish whether [Plaintiff] was disabled." *Id.*

### D.   Remand for Further Proceedings

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke*, 379 F.3d at 593 (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)).  Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted).  Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id*. (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).  "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in rejecting examining physician Dr. Hassman's opinion evidence.  Because the ALJ did not previously call a vocational expert, the Court finds that there are issues to be resolved before a disability

determination can be made.  As such, the Court will remand for further proceedings, including Vocational Expert testimony.  Additionally, the ALJ is directed to reassess Plaintiff's educational status in light of his special education requirements.

## V.      CONCLUSION

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is REMANDED for further proceedings consistent with this decision.

Accordingly, IT IS HEREBY ORDERED that:

1)      Plaintiff's Brief for Plaintiff (Doc. 15) is GRANTED;

2)      The Commissioner's decision is REVERSED and REMANDED;

3)      Upon remand, the Appeals Council will remand the case back to an ALJ on an open record; and

4)      The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 31st day of March, 2017.

Honorable Bruce G. Macdonald
United States Magistrate Judge